UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALLEN PUGLIESE,

               Plaintiff,                      Case No. 13-14257

        v.                             HON. TERRENCE G. BERG

COUNTRY FRESH, LLC and
DEAN FOODS COMPANY,

               Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT (DKT. 10)**

     This is an age discrimination case, brought under Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA"), Mich. Comp. Laws § 37.2101, et seq. Defendants Country Fresh, LLC and Dean Foods ("Defendants") removed this case to federal court on the basis of diversity jurisdiction because the parties are citizens of different states and the amount in controversy exceeds $75,000. (Dkt. 1, pp. 2-3.) Plaintiff Allen Pugliese ("Plaintiff") alleges that Defendants unlawfully terminated Plaintiff's employment because of his age. On July 14, 2014, Defendants moved for summary judgment on Plaintiff's claim. (Dkt. 10.) Plaintiff filed a response (Dkt. 13) and Defendants filed a reply. (Dkt. 14.)  Pursuant to E.D.Mich. LR 7.1(f)(2), no hearing will be held because the Court finds that oral argument will not significantly aid the decision making process.

     Upon careful review and consideration of the pleadings and supporting briefs, the Court finds that there are disputed issues of material fact regarding Plaintiff's

age discrimination claim. Accordingly, Defendants' motion for summary judgment is **DENIED**.

## I.  MATERIAL FACTS

The Court commends the parties for following its practice guidelines for summary judgment briefs.  Defendants' motion for summary judgment listed 83 individually numerated material facts, with specific citations to the record (Dkt. 10, pp. 2-12); Plaintiff's response brief responded to these 83 listed facts, admitting most, and contesting some, with its own specific citations to the record. (Dkt. 13, pp. 1-15.)  Plaintiff also listed 12 additional material facts in his response brief. (*Id.* at 15-16.)  The parties' briefs were thus helpful in identifying the contested factual issues in this matter.  From the parties' briefs and exhibits the Court has gleaned the following facts, which are viewed in a light most favorable to Plaintiff, as the non-moving party.

## A. Melody Farms and Country Fresh

Plaintiff has worked in the dairy industry since 1997, when he was hired by Melody Farms. (*See* Dkt. 13, Ex. A at 5:18-6:14.)  Prior to working at Melody Farms, Plaintiff was employed in "different levels of management" for a series of beverage companies including Coca-Cola, Faygo, Stroh's, and 7UP. (*Id.* at 12:13-25.)  When Melody Farms was acquired by Country Fresh in 1999, Country Fresh re-hired Plaintiff who was then 51 years old. (*Id.* at 6:2-22.) Plaintiff did not submit an application to Country Fresh or "sit down with a HR person," but was apparently retained as part of the process of acquiring of Melody Farms. (*Id.* at 48:14-49:5.)

Country Fresh is a division of Dean Foods and, like Melody Farms, a dairy business.[1] (*See* Dkt. 13, Ex A. at 5:18-6:14; Ex. E at 5:19-20.)

## B. Sales Merchandiser Representative

Plaintiff worked for Country Fresh until his position was eliminated in March 2013 when he was approximately 64 or 65 years old. (Dkt. 13, Ex. A at 6:21-22; 91:21-22; Dkt. 10, Ex. K.) Plaintiff generally enjoyed working for Country Fresh. (*Id*. at 4:17-23.) In 2004, Plaintiff was promoted to a route sales representative position at the age of 55 or 56 requiring him to work "face to face with customers, setting ads and maintaining the shelf space." (Dkt. 10, Ex. A at 53:18-54:16.) Plaintiff worked as a route sales representative until approximately 2008, when he became a sales merchandiser representative ("SMR"). (*Id*. at 55:9-56:4.) An SMR is "connected to the larger business accounts" and "execute[s] the directives from the key account managers for those accounts." (Dkt. 10, ¶ 5.) According to Plaintiff, this change in position was a demotion even though his salary was the same because he "was no longer in the bonus program." (Dkt. 10, Ex. A at 56:1-12.) Plaintiff does not know why his position was changed at that time. (*Id*. at 56:13-20.)

While employed at Country Fresh, Plaintiff worked under a series of immediate supervisors. (Dkt. 13, Ex. A at 52:4-62:13.) Beginning in approximately 2010 or 2011, these immediate supervisors were managed by General Sales Manager Craig MacMillan. (*See* Dkt. 13, ¶ 8; Ex. B at 8:2-9-17.) Plaintiff generally

---

[1] Country Fresh sells dairy products including milk, whipping cream, cottage cheese, sour cream, ice cream, and seasonal products such as eggnog in addition to orange juice, tea, and drinking water. *See* Country Fresh, *Our Products*, http://www.enjoycountryfresh.com/products (last visited Jan. 27, 2015.)

liked MacMillan, agreeing that MacMillan treated him "fairly and well" until Plaintiff's position was eliminated in 2013. (Dkt. 13, Ex. A at 4:22-23, 37:23-38:11.) MacMillan was under the supervision of General Manager Kevin Begin. (Dkt. 13, Ex. A at 5:2-17; Ex. B at 8:7-18.) In approximately 2010, MacMillan offered Plaintiff a merchandising manager position but Plaintiff declined because Plaintiff did not believe that the salary was adequate compensation for the increase in weekly hours. (Dkt. 13, Ex. A at 92:10-93:25; Ex. B at 59:9-15.) Plaintiff was then approximately 60 or 61 years old. (*Id.* at 92:10-11.)

## C. Territorial Sales Representative

In January 2012, Territory Sales Representative Mark Benedict abruptly left his position with Country Fresh to work for a competitor. (*Id.* at 37:9-16, 104:6-105:8.) A territorial sales representative ("TSR") works in a designated territory managing the business relationship with smaller accounts that have only one or two locations. (Dkt. 10, ¶¶ 6-7.) The vacant TSR position was not posted. (Dkt. 10, Ex. B at 71:20-72:2.) Instead, MacMillan scheduled a meeting with Plaintiff and offered Benedict's TSR position to Plaintiff because Plaintiff had worked in Benedict's territory before as a sales representative and "had some relationships with those customers." (Dkt. 13, Ex. B at 28:9-29:2, 71:20-24.)

Although MacMillan does not recall any hesitancy on Plaintiff's part when Plaintiff accepted the TSR position (*Id.* at 29:21-32:14), Plaintiff testified that he expressed some reluctance to take the job because he was afraid it might be eliminated. (Dkt. 13, Ex. A at 105:3-19.) According to Plaintiff, MacMillan tried to

allay Plaintiff's concerns by reassuring Plaintiff that, if the TSR position were eliminated, then Plaintiff could return to his SMR position. (*Id.*) MacMillan testified that no such promise was made. (Dkt. 13, Ex. B at 32:5-14.)

Effective January 16, 2012, Plaintiff became a TSR and received a 10% raise. (Dkt. 13, Ex. F.) According to Plaintiff's 2012 performance evaluation, Plaintiff was very successful as a TSR. (Dkt. 13, Ex. I.) Plaintiff "not only sustain[ed] the current business he inherited but has also been a top performer this year when it comes to new business" and was praised for his "great attitude" and for setting "a great example for the remainder of the group." (*Id.*) In addition, Plaintiff was able to establish the Country Fresh brand in the Toledo, Ohio market. (Dkt. 13, Ex. G.) Due to Plaintiff's performance, he was recommended for an additional 2% merit increase in pay approved in August 2012. (Dkt. 13, Ex. H, Ex. I.)

## D. Paul Karins

As a TSR, Plaintiff's immediate supervisor was Sales Manager Paul Karins. (Dkt. 13, Ex. A at 62:1-9; Ex. C at 10:16-11:11.) Karins had returned to Dean Foods in 2009, having worked there previously from 1997 to 2001. (Dkt. 13, Ex. C at 6:1-7:4.) Karins did not formally apply for a position when he came back to the company, but rather secured employment with Country Fresh in 2009 through his own networking and a meeting with Begin. (*Id.* at 8:6-25.) Karins was given the job of managing the TSRs in 2012 in part because Country Fresh was making some changes to its promotional programs and the way it marketed its products. (Dkt. 13, Ex. C at 11:16-22, 13:3-19.) As a result, the responsibilities of the TSRs were revised

5

so that they could focus on securing new business. (*Id.* at 13:3-19.) Karins was supervised by MacMillan, with whom he spoke "at least once or twice a day minimum." (*Id.* at 14:5-8, 25:2-7.)

Plaintiff acknowledges that he did not like Karins. (Dkt. 13, Ex. A at 63:5.) Plaintiff recounts Karins making many offensive comments about Plaintiff's age, and that others also made such comments.[2] (*Id.* at 94:21-95:3.) Plaintiff testified that Karins would "refer to [Plaintiff] as being old" in front of Plaintiff's peers and customers. (*Id.* at 94:25-95:3.) Plaintiff also recalled that Karins repeatedly referenced Plaintiff's need to have "biscuits and coffee" in the morning because Plaintiff was old. (*Id.* at 100:20-102:20.) Plaintiff perceived that Karin's comments about Plaintiff's age increased in frequency after January 2013 when Plaintiff asked Karins about Medicare eligibility.[3] (*Id.* at 73:11-14, 89:4-15.)

Plaintiff admits that at times he initiated jokes about Karins being a New Yorker or about Karin's age, but only when Karins "would lead [Plaintiff] into it." (*Id.* at 72:21-73:14.) According to Plaintiff, Karins "would present a joke" and Plaintiff "would go along with it." (*Id.* at 72:6-14.) Plaintiff states that he complained once to Karins about the age-related comments and jokes. (*Id.* at 8:14-

---

[2] During his deposition, Plaintiff recalled two other age-related comments that he found offensive. The first was made by Begin at a 2011 or 2012 sales meeting in Grand Rapids. (Dkt. 13, Ex. A at 85:12-86:8.) At the meeting, Plaintiff remembers Begin asking each person to state how long he or she had been with the company and being made to feel like the employees who were around Plaintiff's age looked like "the dinosaurs here and that the new generation will be taking over." (*Id.*) The second comment was made by Plaintiff's former supervisor Ralph Garver while Garver was assisting Plaintiff with Plaintiff's new Blackberry device. (*Id.* at 127:19-128:22.) According to Plaintiff, Garver stated that Garver had "to fix all you old guys up." (*Id.*)

[3] In January 2013, Plaintiff asked Karins about Plaintiff's Medicare eligibility and Karins referred Plaintiff to K. C. Rucker. (Dkt. 10, Ex. C at 30:5-10.) On January 27, 2013, Plaintiff sent Rucker an email asking about having a meeting to discuss Medicare because Plaintiff was about to turn 65. (*Id.* at 30:15-31:16.) Karins was copied on Plaintiff's email to Rucker. (*Id.*; *see also* Dkt. 13, Ex. M.)

20.) Karins, however, does not recall any such exchange. (Dkt. 13, Ex. C at 32:5-7.)

Plaintiff did not complain about age discrimination to MacMillan, Begin, or anyone in human resources while employed. (Dkt. 13, Ex. A at 8:14-11:21.) Plaintiff explains that he did not "want to go around" Karins "for fear of him" and fear of losing his job. (Dkt. 13, Ex. A at 10:7-10.) Although Karins admits that he knew Plaintiff was inquiring about Medicare eligibility and that he had joked with Plaintiff about age, Karins denies making offensive comments or jokes about Plaintiff's age. (Dkt. 13, Ex. C at 30:5-32:7.) According to Karins, it was Plaintiff who repeatedly referenced having biscuits and coffee in the morning and Karins "did not make any reference that it was due to age." (*Id.* at 41:2-9.)

## E. The Reorganization

In approximately late 2012 or early 2013, MacMillan began to formulate a plan to: (1) reduce the number of TSRs because the number of smaller accounts was declining; and subsequently (2) increase the number of SMRs. (*See* Dkt. 13, Ex. B at 32:15-34:6, 49:14-21, 52:8-17.) At that time, there were six TSRs, including Plaintiff, that covered territory in Michigan. (Dkt. 10, Ex. E.) MacMillan concluded that the highest percentage of Country Fresh's independent business was in the Grand Rapids, Lansing, and Detroit areas, and that this territory could be managed more efficiently with fewer TSRs. (Dkt. 13, Ex. B at 57:5-12.) MacMillan, after the plan was prepared, presented it to Begin. (*Id.* at 32:21-23.)

MacMillan's initial plan was to reduce the number of TSRs by two and merge their territories with those of the TSRs that were being retained. (*Id.* at 52:18-54:5,

7

83:3-5.) Under the plan, Gary Protsman's southwest territory was combined with Ralph Garver's central territory while the greater Detroit area territories assigned to Randy Rutherford and Plaintiff were merged into one and assigned to Rutherford.[4] (Dkt. 10, Ex. E, Ex. F.) As a result, Plaintiff's and Protsman's TSR positions were eliminated on approximately March 15, 2013. (Dkt. 10, Ex B at 25:11-13.) These eliminations left Ann Kensa responsible for northern Michigan, Bruce Hartman covering the northeast territory, Garver handling the newly created central-southwest territory, and Rutherford in charge of the newly consolidated greater Detroit territory. (Dkt. 10, Ex. F.)

A few months later, MacMillan determined that "business needs" were such that an additional TSR position had to be eliminated. (Dkt. 10, Ex. B at 83:3-11.) Rutherford was fired on August 31, 2013, and his greater Detroit area territory, which included Plaintiff's former territory, "was absorbed by Bruce Hartman and Ralph Garver." (Dkt. 10, Ex. K; Ex. B at 53:14-18.) Thus, the three oldest TSRs were eliminated within six months under MacMillan's plan: (1) Plaintiff, at age 65; (2) Prostman, at age 60; and (3) Rutherford, at age 59. (Dkt. 10, Ex. K.) The three youngest TSRs were retained: (1) Hartman, aged 53; (2) Kensa, aged 52; and (3) Garver, aged 41. (*Id.*) A new TSR territory was added in approximately May 2014 for James Gaertner, then aged 38. (*See* Dkt. 13, Ex. C at 15:2-16:3; Ex. K.)

MacMillan testified that all the TSRs had good job performance records. (Dkt. 10, Ex. B at 58:9:17.) MacMillan maintains that deciding which TSRs to retain was

---

[4] The record does not reveal why MacMillan initially retained Rutherford instead of Plaintiff to cover the greater Detroit area. (See Dkt. 10, Ex. B; Dkt. 13, Ex. B.)

therefore not based on being "better or worse" or on seniority. (*Id.*) The decision was based solely on where Country Fresh needed "to focus [its] business from a geographic standpoint, like how can we manage it and from where." (*Id.* at 52:8-17.) MacMillan explained that based on this criteria, he determined which TSRs Country Fresh could "leave in place that would most effectively absorb the rest of the business from a geographic standpoint, so from travel time." (*Id.* at 53:1-4.)

MacMillan cited to Grand Rapids, Lansing, and Detroit as areas that represented "a large chunk of business." (*Id.* at 57:5-12.) According to MacMillan, it would not have made sense from "a geographic standpoint" and "from travel time" to retain Plaintiff because Plaintiff lived in southeast Michigan, too far away from Grand Rapids and Lansing to cover those markets as effectively as those TSRs who lived closer. (*See id.* at 53:4-8, 55:1-56:6.) By contrast, Garver lived "right outside of Lansing" and he was therefore retained even though at that time Garver had much less experience as a TSR than Plaintiff did.[5] (*See id.* at 53:4-8, 54:6:24, 55:1-56:6.) While Macmillan maintained that where a TSR lived or was based in relation to an important Country Fresh market was the determinative factor, MacMillan admitted that he never asked Plaintiff whether he would be willing to relocate to Lansing or Grand Rapids in order to keep his position. (*Id.* at 56:7-23.)

---

[5] Garver became a TSR approximately six months prior to Plaintiff's termination. (*See* Dkt. 13, Ex. D at 5:18-10; Ex. C at 17:13-15; Ex. A at 144:2-10.) Previously, Garver was a merchandising manager. (Dkt. 13, Ex. D at 5:23-25.) MacMillan asked Karins "if [Garver] could be put into place [with the TSRs] to give him some additional responsibilities because they were changing the way they were going to the market and they had some other folks that were going to be in charge of the SMRs." (Dkt. 13, Ex. D at 16:17-24.) A territory was created for Garver by combining some accounts from other TSRs. (Dkt. 13, Ex C at 17:4-12; Ex. D at 12:12-24.) After Garver became a TSR, he was trained by the other TSRs, including Plaintiff. (Dkt. 13, Ex. D at 13:3-11; Ex. C at 18:1-18.)

9

MacMillan stated that he ultimately selected which TSRs would be retained although Begin was also involved in the decision-making process. (Dkt. 10, Ex. B at 50:18-22, 56:24-57:20.) Karins learned of the TSR reductions "about a month" before Plaintiff's termination and testified that approximately "two or three weeks before termination," MacMillan asked Karins for his opinion regarding which TSRs should be eliminated. (Dkt. 10, Ex. C at 19:8-20:16.) According to Karins, MacMillan's decision to eliminate Plaintiff's and Prostman's positions was already "pretty much firm" and was made based on "realigning the territories and going to market differently." (*Id.* at 20:13-21:5.) Karins testified that he did not agree or disagree with MacMillan's decision and that he would do what MacMillan needed him to do. (*Id.* at 23:16-25.)

## F. Plaintiff's Termination

MacMillan and Karins both attended Plaintiff's termination meeting on March 15, 2013. (*Id.* at 61:24-62:11.) At the meeting, MacMillan testified that Plaintiff "was frustrated, angry," and "felt like we had promised to give him an SMR job back after his termination." (Dkt. 10, Ex. B at 62:4-25.) According to Karins, Plaintiff was disappointed in Karins and "felt that [MacMillan] did not keep his word to" Plaintiff. (Dkt. 10, Ex. C at 23:10-15.) Despite Plaintiff's having expressed frustration at not being offered his former SMR position, MacMillan never informed Plaintiff that the reorganization envisioned not only a reduction of TSR positions but also a subsequent increase in SMRs because "at the time it didn't cross [MacMillan's] mind to do so." (Dkt. 10, Ex. B at 60:1-61:23, 63:3-5.)

10

**G. SMR Position Openings**

SMR positions had become available two weeks prior to and within a month after Plaintiff's TSR position was eliminated on March 15, 2013. Effective March 1, 2013, four former employees of Liberty Dairy, a separate company, transferred to Country Fresh as new SMRs. (Dkt. 13, Ex. O, p. 2.) The transition from Liberty Dairy began in October 2012 and all four transferees were younger than Plaintiff.[6] (*Id.*) Moreover, after SMR Mike Pawlukiewicz voluntarily quit on March 27, 2013, his open SMR position was posted online on April 9, 2013, approximately three weeks after Plaintiff's TSR position was eliminated. (Dkt. 13, Ex. E at 21:2-24; Dkt. 13, Ex. N.) Plaintiff called Kay Bowen in Country Fresh's Human Resources Department on April 25, 2013 to inquire about the SMR position vacated by Pawlukiewicz. (Dkt. 10, Ex G, pp. 6-7.) Bowen testified that she told Plaintiff he would have to formally apply for the position. (Dkt. 10, Ex. G, pp. 6-7; Dkt. 13, Ex. E at 27:21-25.)

Plaintiff does not recall whether Bowen instructed him to apply online for Pawlukiewicz's SMR position; he believed that regardless of whether Bowen had told him to apply, expressing his interest in the position on the phone was sufficient. (Dkt. 13, Ex. A at 50:15-51:6, 117:5-19.) Michael Homolka was eventually hired to fill Pawlukiewicz's SMR position. (*Id.* at 21:21-24.) By March 27, 2014, an additional seven SMR positions had been created and filled at Country Fresh. (Dkt.

---

[6] The four transferees from Liberty Dairy were: (1) James Wareck, at age 51; (2) Kyle Crook, at age 45; (3) Whitney Hansen, at age 42; and (4) Jamie Gaertner, at age 38. (Dkt. 13, Ex. K, Ex. O.)

13, Ex. O, p. 4.) Plaintiff did not apply for any subsequent SMR openings. (Dkt. 13, Ex. E at 40:19-41:21.)

## H. Plaintiff's Complaints

On March 28, 2013, prior to inquiring about the SMR position vacated by Pawlukiewicz, Plaintiff called the Dean Foods Code of Ethics HelpLine. (Dkt. 13, Ex. L.) Plaintiff lodged a complaint of age discrimination against Karins and MacMillan. (*Id.*) According to Bowen, Plaintiff's complaint was not actually received until June 2013, because the complaint "had gotten lost in the system." (Dkt. 13, Ex. E at 39:3-40:9.) Bowen investigated Plaintiff's complaint by interviewing Karins and MacMillan and attempting to interview Plaintiff who, according to Bowen, told Bowen to send him any questions via email. (Dkt. 13, Ex. E at 30:20-31:21; Dkt. 10, Ex. L.) Bowen did not email Plaintiff any questions but instead relied on her previous conversations with Plaintiff about whether an SMR position was promised to him, and on her interviews with Karins and MacMillan. (Dkt. 13, Ex. E at 31:22-32:6.) Bowen concluded on July 23, 2013 that there was no age discrimination and the decision to eliminate Plaintiff's TSR position involved only "a logical evaluation of skills and abilities necessary to service the customer base." (Dkt. 13, Ex. E at 39:13-16, Dkt. 10, Ex. L, p. 3.)

Plaintiff filed a charge of age discrimination against Country Fresh via the Michigan Department of Civil Rights and the Equal Employment Opportunity Commission ("EEOC") on April 22, 2013.  (Dkt. 13, Ex. Q.) Plaintiff alleged that "younger employees were not treated in the same manner" as he had been and that

12

he had been "subjected to negative age remarks" in violation of the Age
Discrimination in Employment Act of 1967 (the "ADEA"). (*Id.*) Plaintiff
subsequently filed the instant action on September 11, 2013 in Wayne County
Circuit Court. (Dkt. 1, Ex. A, pp. 2.) Defendants removed this case to federal court
on October 7, 2013 on the basis of diversity jurisdiction. (Dkt. 1, pp. 2, 6.)

## II. ANALYSIS

### A. The Standard for Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to judgment as a matter
of law." *See* Fed. R. Civ. Proc. 56(a). A fact is material only if it might affect the
outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 249 (1986). On a motion for summary judgment, the Court must view
the evidence, and any reasonable inferences drawn from the evidence, in the light
most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*,
241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a
genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325
(1986). If the moving party carries this burden, the party opposing the motion
"must come forward with specific facts showing that there is a genuine issue for
trial." *Matsushita*, 475 U.S. at 587. The Court must determine whether the
evidence presents a sufficient factual disagreement to require submission of the

13

challenged claims to a jury or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff").

Moreover, the trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Rather, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001).

## B. Genuine Issues of Material Fact Preclude Summary Judgment

Plaintiff has brought one count against Defendants alleging age discrimination under the ELCRA. (Dkt. 1, Ex. A, p. 7.) Defendants have moved for summary judgment on this count, arguing that: (1) Plaintiff cannot establish a prima facie case of age discrimination because he was terminated as a result of a reduction in force; (2) Karin's comments were merely "stray remarks" rather than evidence of any discriminatory animus; and (3) the Court must infer a non-discriminatory basis for the termination decision under the "same actor doctrine" because the same person promoted and later terminated Plaintiff. (Dkt. 10, p. i.) In light of the material facts and controlling case law, all of Defendants' arguments fail.

14

## 1. Age Discrimination Claim Analysis under the ELCRA

Although Michigan substantive law governs this action, ELCRA age

discrimination claims "are analyzed under the same standards as federal ADEA

claims." *Gieger v. Tower Automotive*, 579 F.3d 614, 626 (6th Cir. 2009) (citation

omitted); *see also Meager v. Wayne State Univ.*, 222 Mich. App. 700, 709 (1997).

Plaintiff may establish age discrimination by presenting either direct or

circumstantial evidence.[7] *See Gieger,* 579 F.3d at 620. Because Plaintiff relies on

circumstantial evidence, the analysis of his discrimination claim under the ELCRA

is guided by the burden-shifting framework established in *McDonnell Douglas Corp.*

*v. Green,* 411 U.S. 792 (1973). *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818

(6th Cir. 2011); *see also Lytle v. Malady,* 458 Mich. 153, 171-75, 173 n. 19 (1998);

*Hazel v. Ford Motor Co.*, 464 Mich. 456, 462-64 (2001).

Under the *McDonnell Douglas* framework, Plaintiff must first establish a

prima facie case of discrimination by a preponderance of the evidence. *See Lytle*, 458

Mich. at 172. If Plaintiff does so, a presumption of discrimination arises and the

burden then shifts to Defendants to assert a legitimate, non-discriminatory reason

for firing Plaintiff. *Id.* at 173. Plaintiff may then respond with evidence that

Defendants' proffered reason is a mere pretext for discrimination. *Id.* Plaintiff can

rely on the same evidence to prove both pretext and discrimination as long as the

---

[7] "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (internal quotation marks omitted). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

evidence would enable a reasonable factfinder to infer that the employer's decision had a discriminatory basis. *See id.* at 178.

The *McDonnell Douglas* test, as adopted by the Michigan Supreme Court in ELCRA age discrimination cases, "is not to be applied mechanically, but with due deference to the unique facts of the individual case." *Lytle*, 458 Mich. at 173 n. 19. Plaintiff always retains the "burden of persuading the trier of fact that [Defendants] intentionally discriminated" against him. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Under the ELCRA, however, Plaintiff does not need to establish that his age was *the* reason for his termination. The ultimate question in the context of summary judgment is whether age was a motivating factor in the termination decision. *See Lytle*, 458 Mich. at 175-76.

### 2. Plaintiff's Prima Facie Case of Age Discrimination

Under the ELCRA, the elements of a prima facie case of age discrimination based on the former employee's termination are that: (1) Plaintiff was a member of a protected class;[8] (2) he suffered an adverse employment action; (3) he was otherwise qualified for the position held; and (4) he was replaced by someone outside of the protected class. *Geiger*, 579 F.3d at 622; *see also Marsh v. E. Associated Estates Realty*, 521 Fed. App'x 460, 466 (6th Cir. 2013); *Lytle*, 458 Mich. at 177 (describing the fourth element as requiring replacement "by a younger person").

---

[8] The ADEA applies only to employees who are "at least 40 years of age." Age Discrimination in Employment Act, 29 U.S.C. § 631(a). The ELCRA does not have an age limitation. *See* Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101, et seq.

16

Because Plaintiff's termination in this case arose as part of a work force reduction[9] and he was not replaced,[10] the fourth element must be modified to require instead "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons."[11] *Geiger*, 579 F.3d at 623 (citing *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465-66 (6th Cir. 1990)). The guiding principle in such cases "is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of age." *Barnes*, 896 F.2d at 1466.

---

[9] Defendants maintain that Plaintiff was terminated "due to a reduction in force." (Dkt. 10, p. 13.) A workforce reduction occurs "when business considerations cause an employer to eliminate one or more positions within the company." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (*accord Lytle*, 458 Mich. at 177 n. 27). Plaintiff does not dispute that he was let go as part of a reorganization at Country Fresh. (*See* Dkt. 1, Ex. A, p. 3 at ¶ 18, Dkt. 13, ¶¶ 37-51.)

[10] Plaintiff argues that even though Garver had been a TSR for six months when Plaintiff's TSR position was eliminated, Garver effectively "replaced" Plaintiff because part of Plaintiff's territory was eventually added to Garver's existing territory. (Dkt. 13, p. 20.) Plaintiff relies on *Mazzeo v. Color Resolutions Intern., LLC,* 746 F.3d 1264 (11th Cir. 2014), in which a former employee sued his former employer alleging age discrimination under the ADEA and the Florida Civil Rights Act. Under Michigan law, an employee "is not eliminated as part of a work force reduction" if he or she is replaced. *Barnes*, 896 F.2d at 1465 (*accord Lytle*, 458 Mich. at 177 n. 27). An employee "is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work." *Id.* Replacement occurs "only when another employee is hired or reassigned to perform the plaintiff's duties." *Id.* Under this definition, Plaintiff was thus not replaced because his territory was simply redistributed among his fellow TSRs, to be handled in addition to their own similar work. (Dkt. 10, Ex. E, Ex. F). Moreover, Plaintiff's territory was not given to Garver directly; it was first merged with Rutherford's territory and, after Rutherford was terminated approximately five months later, Rutherford's territory was "absorbed by Bruce Hartman and Ralph Garver." (Dkt. 10, Ex. K; Ex. B at 53:14-18.)

[11] According to the *Barnes* Court, this modification is not meant to create any "undue hardship for age discrimination plaintiffs who are eliminated as part of a work force reduction." 896 F.2d at 1465. The *Barnes* Court suggests that a plaintiff could still establish a prima facie case in many ways including "by showing that he or she possessed qualifications superior to those of a younger co-worker working in the same position" or "that the employer made statements indicative of a discriminatory motive." *Id.* at 1466.

### a.     First Three Elements Established

Plaintiff meets the first three elements of his prima facie case. As to the first two elements, membership in the protected class and suffering and adverse employment action, Plaintiff was 64 or 65 years old when Country Fresh eliminated his TSR position. (Dkt. 13, Ex. A at 6:21-22; 91:21-22; Dkt. 10, Ex. K.) As to the third element, there is no dispute that Plaintiff was qualified to hold his TSR position. The Supreme Court of Michigan established that "[a]n employee is qualified if he was performing his job at a level that met his employer's legitimate expectations" and "was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Town v. Michigan Bell Tel. Co.*, 455 Mich. 688, 699, 699 n. 22 (1997); *see also Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 585 (6th Cir. 2002) (applying standard established in *Town).* Plaintiff was extremely successful as a TSR according to his performance evaluation, earning praise as "a top performer" who did "an extraordinary job in a difficult situation." (Dkt. 13, Ex. I.)

### b.     Defendants Dispute the Fourth Element

The fourth element is in dispute. Defendants argue that Plaintiff cannot establish a prima facie case because Plaintiff was terminated as part of an economically-motivated reduction in force. (Dkt. 10, p. 14.) According to Defendants, Plaintiff "merely disagrees" with Country Fresh's business decisions made during the reorganization. (*Id.* at 15.) Defendants, citing *Matras v. Amoco Oil Co.*, 424 Mich. 675, 684 (1986), emphasize that simply showing that a younger person was

18

retained and an older person was terminated is not enough to establish that the reduction in force was just "an excuse to get rid of older workers" at Country Fresh. (*Id.* at 14.)

The question, however, is whether Plaintiff has provided sufficient evidence to create a genuine issue of material fact as to whether Defendants "intentionally discriminated against the plaintiff because of age" when deciding which TSRs to eliminate during the reorganization. The evidence adduced by Plaintiff does more than merely show that Plaintiff's position was eliminated while younger TSRs were retained; it presents proof supporting an inference of discrimination based on age. (Dkt. 13, p. 19.) At the outset, the record shows that it was not only Plaintiff's position that was eliminated; of the six TSR positions that existed during Plaintiff's tenure, the positions of the three oldest were eliminated under the reorganization plan while the three youngest were retained. (Dkt. 10, Ex. K.) Prior to the reorganization, Plaintiff had been praised for doing "an extraordinary job" and for his "great attitude." (Dkt. 13, Ex. I.)

### c.   Karins' Age-Related Comments

Plaintiff also offers evidence of discriminatory animus on the part of his immediate supervisor Karins, who Plaintiff contends had influence over the termination decision because Karins was in daily contact with MacMillan. (Dkt. 13, p. 23.) Plaintiff was terminated in March 2013, three months after he began inquiring about Medicare eligibility and revealing to Karins that he was almost 65 years old. (Dkt. 13, Ex. K; Dkt. 13, Ex. M.) Both MacMillan and Karins attended

Plaintiff's termination meeting, which took place after Karins had allegedly had been making disparaging remarks about Plaintiff's age on a weekly basis ever since Plaintiff first inquired about Medicare. (Dkt. 13, Ex. A at 89:3-20.)

Defendants argue that Karins' age-related comments are nothing more than "stray remarks" made by someone other than the decision maker and therefore cannot be "evidence of discriminatory animus." (Dkt. 10, p. 17.) Alleged discriminatory remarks can be imputed to the decision maker if four requirements are met: (1) the alleged discriminatory remarks were made by the person who made the adverse employment decision or by an agent of the employer that was involved in the challenged decision; (2) the alleged discriminatory remarks were part of a pattern of biased comments; (3) the alleged discriminatory remarks were made in close temporal proximity to the challenged employment decision; and (4) the alleged discriminatory remarks were clearly reflective of discriminatory bias. *See Michigan Dep't of Civil Rights ex rel. Burnside v. Fashion Bug of Detroit,* 473 Mich. 863, 867 (2005) (citing *Krohn v. Sedgwick James of Michigan, Inc.*, 244 Mich. App. 289, 292 (2001)).

Regarding the first requirement of the stray remarks analysis, Karins was Plaintiff's immediate supervisor and in daily contact with MacMillan, who made the ultimate termination decision. (Dkt. 10, Ex. C at 14:5-8, 10:16-11:11, 25:2-7.) According to Karins, approximately one month before Plaintiff was terminated, MacMillan solicited Karins' input regarding which TSRs should be retained. (*Id.* at 19:8-20:16.) Karins was also present at Plaintiff's termination meeting. (*Id.* at

20

61:24-62:1.) Although Karins denied having any influence over the termination

decision (*Id.* at 20:13-21:5), these facts are sufficient to create a genuine question for

a jury as to whether and to what extent Karins exercised influence over the decision

to terminate Plaintiff.

There is also a genuine issue of material fact as to whether, when, and how

often Karins made age-related comments about Plaintiff and whether these

comments were evidence of discriminatory animus. Karins denies ever making any

discriminatory remarks about Plaintiff's age. (*Id.* at 30:5-32:7.) Karins, however,

does admit to joking with Plaintiff about his age and being aware of Plaintiff's

inquiries about Medicare eligibility. (*Id.*) According to Plaintiff, Karins' comments

reflected negative stereotypical assumptions against the elderly in that Karins

would "refer to [Plaintiff] as being old" in front of Plaintiff's peers and customers

and made repeated offensive references to Plaintiff needing "biscuits and coffee" in

the morning like an old person.[12] (Dkt. 13, Ex. A at 94:25-95:3, 100:20-102:20.)

Plaintiff testified that, at first, Karin made age-related comments "once or twice"

after Plaintiff became a TSR. (*Id.* at 89:5-20.) Then, according to Plaintiff, Karins

established a pattern of making age-related comments on a weekly basis after

---

[12] What constitutes a discriminatory versus a stray remark is a fact-specific determination made in light of the context of the entire record of a case. For example, statements that Plaintiff was a "grumpy old man" and that the job was "getting to be tiring" for Plaintiff were insufficient to support a rational inference of age-related bias in *Wexler*. 317 F. 3d 564, n. 15. In *Shaw v. Ecorse*, 283 Mich. App. 1 (2009), statements by an interviewer that the interviewee was "too old" for a position were found to be relevant in establishing that age was a factor in Plaintiff's removal as police chief. A supervisor's comment that the employee being fired was "getting too old for this shit" was, when viewed in the light most favorable to Plaintiff, found on summary judgment to be a possible indicator of discriminatory motive for termination. *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 538-39 (2001). Finally, remarks that a company was "run by white haired old men, waiting to retire" were found on summary judgment to strongly suggest that the speaker harbored a bias against older workers. *Scott v. Goodyear Tire & Rubber Co.*, 160 F. 3d 1121, 1129 (6th Cir. 1998).

Plaintiff inquired about Medicare eligibility in January 2013 and continued to make weekly comments until Plaintiff was terminated 20 weeks later. (*Id.*) The comments continued even after Plaintiff says he asked Karins to stop. (*Id.* at 8:14-20.)

Whether Karins was involved in the decision to terminate Plaintiff and whether Karins' age-related comments were evidence of discriminatory animus are questions that may be resolved only by credibility determinations of the jury. If a jury credits Plaintiff's testimony, it could reasonably find that the four requirements of the stray remarks test have been met. The conflicting testimony creates a genuine issue of material fact as to whether Karins, as Plaintiff's immediate supervisor responsible for supervising all the TSRs who was in daily contact with MacMillan, influenced the decision to terminate three TSRs. Similarly, there is sufficient evidence to raise a genuine issue as to whether Karins had established a pattern of making age-related remarks after learning of Plaintiff's approximate age. These statements could be interpreted as revealing a bias against older people. Thus, Karins' statements could reasonably be viewed as circumstantial evidence of age discrimination imputable to Defendants.

Defendants maintain that the termination decision was not based on age but rather on each TSR's geographic location in relation to a major market such as Grand Rapids, Lansing, and Detroit. (Dkt. 10, Ex. B at 52:8-53:4; Dkt. 14, p. 4.) MacMillan stated that it did not make sense "to have Al Pugliese drive all the way over to Grand Rapids to cover that market" but admitted that he never asked Plaintiff whether Plaintiff would be willing to relocate or cover new territory. (*Id.* at

22

53:4-8, 56:7-9.) The record does not reveal why Plaintiff, who lived in southeast Michigan (Dkt. 10, Ex. B at 56: 2-3), was not retained to cover the greater Detroit area territory over the younger TSR Rutherford (Dkt. 10, Ex. K). Rutherford was eliminated a few months after Plaintiff, and Garver, the youngest TSR at the time, was given part of the greater Detroit area to cover, even though he was then living in Lansing.[13] (Dkt. 10, Ex. K; Ex. B at 53:14-18.) From the evidence surrounding the termination decision and Karins' alleged influence, a genuine issue of material fact exists as to whether Defendants "singled out" Plaintiff for termination under the reorganization plan at least in part because of his age.

### d.    Denial of an SMR Position

Finally, Plaintiff offers evidence that Defendants denied him an SMR position after his TSR position was eliminated as "further evidence of discrimination." (Dkt. 13, p. 21.) Defendants maintain that evidence of Plaintiff not being "returned to an SMR position as promised" after his termination is insufficient to show discriminatory animus on the part of Defendants. (Dkt. 10, p. 16.) First, Defendants argue that there were no open SMR positions "at the time that Plaintiff's position was eliminated." (*Id.)* Second, Defendants were under no obligation to transfer Plaintiff or inform him of any opening for which he might be qualified. (*Id.* at 16-17.)

Plaintiff, however, has offered sufficient evidence that, if believed, creates a jury question as to whether Defendants denied Plaintiff an SMR position for

---

[13] Garver's territory after the reorganization plan was implemented appears to extend as far as Indiana and Ohio. (Dkt. 10, Ex. F.)

discriminatory reasons. MacMillan testified that the reorganization plan involved reducing the number of TSRs and taking on more SMRs. (Dkt. 10, Ex. B at 32:24-34:6.) Four SMR positions were filled two weeks before Plaintiff's termination by younger Liberty Dairy employees as part of a transition that began five months prior. (Dkt. 13, Ex. O., p. 2.) Within a month of Plaintiff's termination, an SMR opening was posted online as the result of a resignation. (Dkt. 13, Ex. N.) Even if that resignation was unanticipated, an additional seven SMR positions were created and filled within a year of Plaintiff's termination. (Dkt. 13, Ex. O, p. 4.)  A reasonable jury could thus conclude that MacMillan and Karins were aware at the time Plaintiff was terminated that there had been and would be SMR job openings.

The decision not to consider Plaintiff for SMR positions must be considered in the context of Plaintiff's testimony that MacMillan assured him that he could return to an SMR position if his TSR position were ever eliminated. (Dkt. 13, Ex. A at 105:3-19.) Plaintiff maintains that he relied on MacMillan's statement, and both MacMillan and Karins acknowledged that Plaintiff reminded MacMillan of this alleged promise during the termination meeting. (Dkt. 10, Ex. B at 62:4-25; Dkt. 10, Ex. C at 23:10-15.) Despite Plaintiff's reminder, neither MacMillan nor Karins mentioned that SMR positions had recently opened, or that such positions would likely continue to become available as part of the reorganization.

Defendants argue that there were postings for SMR positions that Plaintiff simply did not formally apply for despite being instructed to do so by Bowen. (Dkt. 10, p. 17.) First, whether Bowen did or did not inform Plaintiff that he would have

to formally apply for any SMR position is a question of fact for the jury. Plaintiff testified that when he did call about an open SMR position that he had learned about on his own, no one instructed him to apply formally and that he believed, based on his previous experience with Country Fresh, that he "basically applied for [the job] over the phone." (Dkt. 13, Ex. A at 117:12-13.)

A reasonable jury could also find that formally applying for a position at Country Fresh was not the only way to secure employment or move between jobs. Plaintiff testified that there are "at least three ways" to apply for a job at Country Fresh: (1) online through Dean Foods; (2) a resume; or (3) networking. (Dkt. 13, Ex. A at 49:12-50:23.) When Plaintiff was first hired by Country Fresh, he stated that he did not submit an application or "sit down with an HR person," but was retained as part of the acquisition of Melody Farms. (*Id.* at 48:14-49:5.) Karins also did not formally apply for a position when he returned to Dean Foods in 2009, but instead secured employment through his own networking and an eventual meeting with Begin. (Dkt. 13, Ex. C at 8:6-25.) Moreover, Plaintiff did not formally apply for his TSR position; MacMillan scheduled a meeting with Plaintiff and offered Plaintiff the position. (Dkt. 13, Ex. B at 28:9-29:2, 71:20-24.) Based on this evidence, a fact finder could reasonably infer that it was possible for an applicant to be offered a position at Country Fresh without having completed a formal application process.

On this record, the evidence presents a genuine issue of material fact as to whether age was a motivating factor in the decision to terminate Plaintiff. Although Plaintiff expressed an interest in, and arguably applied for, an SMR position after

25

his TSR position was eliminated, Defendants concede that they did not acknowledge Plaintiff's interest nor inform Plaintiff of the possibility of other SMR openings. Taken all together, these facts raise the question whether Defendants' decisions were motivated by Plaintiff's age. As such, Plaintiff has offered sufficient evidence to allow the jury to determine whether Plaintiff was subjected to age discrimination, in violation of the ELCRA.

### 3.   Defendants' Nondiscriminatory Reason

In response to Plaintiff's evidence, Defendants argue that the termination decision was made as part of a nondiscriminatory, economically-motivated reduction in force and based solely on geography rather than age. (*See* Dkt. 10, p. 14; Dkt. 14, p. 4-5.)  Plaintiff can rely on the same evidence to prove both pretext and discrimination as long as the evidence would enable a reasonable factfinder to infer that the employer's decision had a discriminatory basis. *See Lytle*, 458 Mich. at 178.

As discussed above, Plaintiff has offered sufficient evidence that, when viewed in the light most favorable to him, creates a jury question as to whether Defendants "singled out" Plaintiff for discriminatory reasons when implementing the reduction of TSRs and the hiring of SMRs. The evidence, therefore, has created a question of material fact as to whether Defendants' nondiscriminatory reason for Plaintiff's termination was a mere pretext.

### 4.   The Same Actor Doctrine

Defendants, relying on *Town*, 455 Mich. at 700, also argue that the trier must draw an inference that Country Fresh could not have had a discriminatory basis for the termination decision because the same actor, MacMillan, both hired Plaintiff as a TSR and subsequently made the decision to eliminate Plaintiff's position. (Dkt. 10, pp. 20-21.) As Plaintiff notes, however, *Town* relied on Federal law that was subsequently reversed.[14] (Dkt. 13, p. 24.) The Sixth Circuit has rejected "the idea that a mandatory inference must be applied in favor of a summary-judgment movant whenever the claimant has been hired and fired by the same individual." *Wexler*, 317 F. 3d at 573-74. If the trier of fact decides to draw such an inference, "it is insufficient to warrant summary judgment for the defendant" where, as here, "the employee has otherwise raised a genuine issue of material fact." *Id*. Because Plaintiff has raised a genuine issue of material fact regarding the termination decision, Defendants' argument fails and summary judgment must be denied.

### III. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Dkt. 10) is **DENIED**.

**SO ORDERED.**

s/Terrence G. Berg
TERRENCE G. BERG
UNITED STATES DISTRICT JUDGE

Dated:  January 28, 2015

---

[14] Defendants, in their reply brief, did not respond to Plaintiff's argument. (*See* Dkt. 14.)

## **Certificate of Service**

I hereby certify that this Order was electronically submitted on January 28, 2015, using the CM/ECF system, which will send notification to each party.

s/A. Chubb_____
Case Manager